IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


William Johnson,                    :

        Plaintiff,                  :

    v.                              :    Case No. 2:04-cv-0775

U.S. Department of Labor,           :    MAGISTRATE JUDGE KEMP

        Defendant.                  :

OPINION AND ORDER

By filing this action, plaintiff, William Johnson, has asked
the Court to review a decision of the Administrative Review Board
of the Department of Labor.  The parties have consented to have
the case decided by the Magistrate Judge pursuant to 28 U.S.C.
§636(c).  Each party has moved for summary judgment, which is the
proper procedural vehicle through which to bring the merits of
the decision of the Administrative Review Board before the Court.
For the following reasons, the Court affirms the decision of the
Administrative Review Board in all respects and directs the Court
to enter judgment in favor of defendant the United States
Department of Labor.

I.

Although the case is before the Court by way of cross-
motions for summary judgment, the facts of the case are not in
dispute.  The only issue in the case is whether, under the
appropriate standard of review, the decision of the
Administrative Review Board should be affirmed or rejected.  The
following is a summary of the facts set forth in the six-volume
administrative record which has been filed with the Court.

This case arises out of a contract which was awarded to a
company named Rasputin, Inc.  The contract called for Rasputin to

provide security guard services for the Department of the Navy at
bases in Florida. Rasputin had submitted a bid to the Department
of Navy on July 11, 1995. In a letter dated September 5, 1995,
the contracting officer signed the contract on behalf of the
Department of Navy. The contract called for services to be
performed from October 1, 1995 through September 30, 1996. The
amount of the contract award was $1,345,160.00.

Rasputin was a successor contractor. The prior contractor,
DGS, had entered into a collective bargaining agreement with a
union which represented its employees. Under applicable
regulations, Rasputin was required to honor any collective
bargaining agreements in place, even if its employees were not
union employees, and was prohibited from paying the employees
less than the predecessor contractor had paid them. The contract
also set forth, in Section C.33, that "[t]he minimum wages
required to be paid for work under the specification are
contained in Section J, List of Attachments. All non exempt
employees are to paid in accordance with this attached wage
determination."

Section J of the contract contained wage determinations made
by the United States Department of Labor (DOL). A note on page
J-1-3 (R. 578) advised Rasputin that "[i]n accordance with
Section 4(c) of the Service Contract Act, as amended, the wage
rates and fringe benefits set forth in this wage determination
are based on the collective bargaining agreement(s) under which
the incumbent contractor is operating." Although the contract
set forth wages and fringe benefits provided by the agreement, it
stated that "failure to include any job classification, wage
rate, or fringe benefit encompassed in the collective bargaining
agreement does not relieve the successor contractor of the
statutory requirements to comply as [sic] a minimum with the
terms of the collective bargaining agreement insofar as wages and

2

fringe benefits are concerned."

Section J also contains a collective bargaining agreement and addenda. One of the addenda, with an effective date of October 1, 1994, indicated that security guards were to be paid $6.01 an hour at the Naval Air Rework Facility, one of the bases covered by the contract. (R. 597-600). Another addendum with the same effective date indicated that persons employed in a "Guard I" position at the Naval Supply Center, a different facility, were to be paid $5.12 per hour. (R. 601-603). The significance of these two separate addenda will be explained more fully below.

Prior to the award of the contract to Rasputin, DGS and the union entered into another addendum to the collective bargaining agreement. That addendum was not specifically incorporated into the contract which Rasputin signed. The addendum provided that effective October 1, 1995, security guards at the Naval Air Rework Facility would receive an increase in their pay from $6.01 per hour to $6.26 per hour. (R. 728-31). Additionally, contributions were to be made to a Health and Welfare Fund and Pension Fund on behalf of those employees. DGS never paid the higher rates set forth in this addendum because the rate was effective October 1, 1995, the same date on which Rasputin replaced DGS as the contractor for security guard services.

Rasputin claims to have been confused by the various wage rates set forth in the contractual addenda. On November 9, 1995, it contacted the administrator of the Wage and Hour Division of the Department of Labor to ask for a new wage determination (R. 854-947). It is unclear whether there was ever a formal response to this request. However, the Department of Labor ultimately determined, through the investigation that led to the underlying administrative enforcement action, that the applicable wage rate was $6.26 per hour.

3

Rasputin did not pay its security guards $6.26 an hour, rather, it appears that they were all paid $5.12 an hour and that benefit contributions were either not made, or not made in accordance with the last addendum to the Collective Bargaining Agreement.  After delays in making payroll which persisted throughout the life of the contract, Rasputin finally abandoned the contract, paying no wages for the last month during which its employees provided contracted services.

The Department of Labor conducted an investigation of Rasputin and determined that it had violated the McNamara-O'Hara Service Contract Act ("SCA"), 41 U.S.C. §§351 et seq. by not paying appropriate wages to its employees.  Terri Whaley, an investigator for the Department of Labor, determined that the total amount of underpayments was $280,079.62, consisting of $136,600.00 in underpaid wages, and $143,480.00 for fringe benefit violations.  She submitted an affidavit to that effect (R. 46-48).  Rasputin authorized the remaining funds under the contract to be applied to that outstanding balance.  After applying the $106,619.28 still remaining to be paid to Rasputin, Ms. Whaley determined that Rasputin owed $173,460.34.  Id.

The Department of Labor concluded that Rasputin was not the only party responsible for this violation.  Under applicable law, more fully described below, individuals as well as corporate contracting parties may be legally responsible for violations of the SCA, in which case the individuals become liable both for the underpayments and also subject to other penalties, including debarment for a period of years.  Debarment prohibits the person debarred from bidding on government contracts during the period of debarment.  Here, the DOL concluded that William Johnson was also a responsible party, and initiated administrative proceedings in order to obtain both an order for payment of the money owed and for debarment.

Although Rasputin was named as a party to the administrative proceedings, it did not appear, and relief was awarded against it by default.  William Johnson appeared through counsel and contested both the finding that the Act had been violated and that he was a responsible party.  Both issues were determined against him, and the DOL imposed a three-year period of debarment, refusing to find "unusual circumstances" which would militate against imposing debarment even though William Johnson had been found to be responsible for Rasputin's violations of the SCA.  Mr. Johnson has appealed the final decision of the DOL, which consists of the decision of the DOL Administrative Review Board dated May 28, 2004 (R. 1662-74).

II.

Under regulations promulgated pursuant to the FCA, a broad range of individuals can be held liable for corporate violations of the SCA.  29 C.F.R. §4.187(e)(4) provides that such responsibility is not limited to officers of a contracting firm or signatories to the contract itself, but includes anyone who exercises control, supervision, or management over the performance of the contract and who causes or permits a contractual breach to occur, whether through action or inaction. The issue of whether William Johnson was such a responsible party was presented primarily through testimony at an administrative hearing held before an Administrative Law Judge.  The following is a summary of the testimony at the hearing, as well as other evidence, relating to the question of whether William Johnson was a responsible party under the contract in issue.

The evidence concerning William Johnson's legal relationship to Rasputin, Inc. came primarily from Mr. Johnson.  According to his testimony and various exhibits, most of which were not disputed, Rasputin, Inc. was a wholly owned subsidiary of another corporation named Clean Serve, Inc.  The shareholders of Clean

5

Serve, Inc. were originally Mr. Johnson's brother, Wallace (or Jamie) and another individual. At some point, Mr. Johnson's brother became the sole shareholder. Neither Clean Serve nor its principals had any background in government contracting. When William Johnson became aware of the opportunity to bid on the Jacksonville Naval Base security contract, he offered to assist his brother in obtaining the work. At least part of that assistance included a representation to the contracting officer that William Johnson was the President of Rasputin, Inc., and William Johnson's attendance at a pre-contract meeting.

The evidence before the ALJ diverged sharply on what occurred after those events. William Johnson concedes that he suggested to his brother that a long-time business associate or employee of William Johnson's, Curtis Wayne Stewart, be given primary responsibility to oversee the contract. It is undisputed that Mr. Stewart did so. However, Mr. Stewart and Mr. Johnson differed in their version of how this came about.

According to Mr. Stewart, shortly prior to the commencement of the work in October of 1995, William Johnson handed him the contract and advised Mr. Stewart that Rasputin had been the low bidder. Mr. Johnson asked Mr. Stewart to look over the contract and to review the bid price. According to Mr. Stewart, that was when he first detected the discrepancy and the wage rates to be paid. He also concluded that Rasputin would not be paid enough money under the contract to cover its costs. Consequently, he advised Mr. Johnson that Rasputin should not accept the contract. Mr. Johnson rejected that advice, explaining that the issues identified by Mr. Stewart at the Jacksonville facility would be offset by money made on other parts of the same contract involving a Marine base north of Jacksonville.

Once the decision was made to proceed, Mr. Stewart became the operations manager for the job. According to Mr. Stewart, he

6

reported directly to William Johnson concerning "anything and everything that related to the contract...." (R. 90).  Mr. Stewart did not deal with any other person regarding the final decisions to be made on the contract, including the wages that were to be paid to the employees.  (R. 93-94).  Mr. Johnson was also involved in hiring decisions for supervisors of the site. (R. 96-97).  As Mr. Stewart summarized his testimony, for this contract "Mr. Johnson gave the orders.  I was the operations manager.  Mr. Holman was project manager." (R. 97).

In August of 1996, William Johnson advised Mr. Stewart that the Department of Navy was going to rebid the security contract because of problems with the way Rasputin was performing.  Mr. Johnson persuaded Mr. Stewart to create a corporation and submit a bid.  He did, but it was unsuccessful.  Mr. Johnson then asked Mr. Stewart for a controlling interest in the corporation.  When Mr. Stewart refused, he was asked to, and did, resign his positions with Mr. Johnson's companies.

William Johnson's testimony contradicted Mr. Stewart's assertion that Mr. Johnson was the final decisionmaker on all matters pertaining to the contract, including the payment of specific wage rates to security guards.  As noted above, Mr. Johnson testified that his initial involvement with the contract was only as an accommodation to his brother, and that immediately after the pre-contract meeting he relinquished any role in the corporation until August of 1996 when he assumed the presidency in order to try to rectify the situation created when Rasputin was unable to make payroll.  He testified that his last involvement in Rasputin after the pre-contract meeting was selling trucks to Rasputin.  (R. 441).  He did admit recommending that Lee Holman be hired as the on-site supervisor and that Mr. Stewart administer the contract.  (R. 441-42).  Otherwise, he flatly denied dealing with daily operations issues.  (R. 442-44).

7

He received no wages or other remuneration from Rasputin.

A number of other witnesses testified on the same subject. Several of them, who dealt only with the Florida end of the operation, offered hearsay statements to the effect that William Johnson was the person responsible for making decisions with respect to the performance of the contract.  Darlene Ford, who worked for William Johnson at one time, testified that Mr. Johnson never had anything to do with Rasputin.  (R. 366).  She further testified that Mr. Stewart essentially ran the operation from Jackson, Ohio, although he occasionally met with William Johnson's brother to talk about the contract.  Earl Macon, who was the assistant manager on site in Jacksonville and later became the project manager, testified that he always dealt with Wayne Stewart and that he did not know William Johnson.  However, he also testified that when he dealt with Wayne Stewart, Mr. Stewart never had authority to answer his questions directly but was always required to check with someone else.  He did not have direct knowledge of who that person was.

III.

The parties agree that there are four issues which require examination.  All are phrased in terms of whether the Administrative Review Board properly resolved these issues.  They are:

1.  Whether William Johnson is a "party responsible" for Rasputin's violations of the SCA;

2.  Whether Rasputin (and therefore Johnson) owes back wages in the amount of $173,460.34 arising from such violations;

3.  Whether Mr. Johnson was properly debarred from bidding on government contracts for three years; and

4.  Whether any provision of the United States Bankruptcy Code (Mr. Johnson has filed a personal bankruptcy and received a discharge) affects the Department of Labor's orders pertaining to

8

Mr. Johnson.

The Court will address these issues in a slightly different order.  The first question to be resolved is whether the Department of Labor correctly decided that Rasputin owed back wages and, as a result, violated the SCA.  If there was no violation, it is irrelevant whether Mr. Johnson was a responsible party.  After the Court addresses that issue, and if the DOL's decision concerning violations is upheld, the Court will then address the question of whether Mr. Johnson was properly held responsible for those violations, properly debarred, and whether those actions can stand in light of his bankruptcy filing. Before answering any of these questions, however, it is essential to determine the appropriate standard under which the Court reviews the Administrative Review Board's decision.

A.

The parties agree that the Court is authorized to review the DOL decision under the Administrative Procedure Act.  However, rather than the usual standard for reviewing agency actions under that statute, which is an "arbitrary and capricious" standard, the relevant statutory scheme sets forth a somewhat different standard.  As this Court noted in Elaine's Cleaning Service v. United States Department of Labor, 1995 WL 1612534 (S.D. Ohio), aff'd 106 F.3d 726 (6th Cir. 1995), 41 U.S.C. §353(a) "provides that Sections 4 and 5 of the Walsh-Healey Act, 41 U.S.C. §§38 and 39, apply with respect to the Secretary's authority to enforce provisions of the Act."  41 U.S.C. §39 provides that findings made by the Secretary of Labor in an administrative proceeding such as this one are "conclusive in any court of the United States" if those findings are "supported by the preponderance of the evidence...."  Id. at *1.  In other words, as Elaine's Cleaning held, "'The District Court's scope of review is limited to the legal question of whether the ALJ applied and satisfied

9

the standard of proof required to find a violation of the Service Contract Act.' American Waste Removal Co. v. Donovan, 748 F.2d 1406, 1408 (10th Cir. 1984)." Id. Thus, the DOL's findings of fact are conclusive if the ALJ applied and satisfied the preponderance of the evidence standard, and all other aspects of the ALJ's decision must be sustained unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Elaine's Cleaning Service v. U.S. Department of Labor, 106 F.3d 726, 728 (6th Cir. 1995), citing ASG Industries v. United States, 548 F.2d 147, 151 (6th Cir. 1977).

Although Elaine's Cleaning appears to indicate that in reviewing factual findings of the DOL, the Court should assure itself only that the ALJ or the Administrative Review Board applied the preponderance of the evidence standard, there is obviously some substantive component to the Court's review beyond assuring that the decision recites that such a standard was utilized. As the American Waste Removal Co. decision, quoted above, indicates, the question is not only whether the ALJ applied that standard of proof but also "satisfied" it. American Waste Removal, 748 F.2d at 1048. Nevertheless, in determining whether the ALJ satisfied the preponderance of the evidence standard, the Court does not review the evidence de novo. Several courts have concluded that the proper standard is whether the decision is "clearly erroneous." See, e.g., Dantran, Inc. v. United States Department of Labor, 171 F.3d 58 (1st Cir. 1999); see also J.N. Moser Trucking v. United States Department of Labor, 306 F.Supp. 2d 774 (N.D. Ill. 2004). Each of those decisions used a different rationale to come to the same conclusion that the "clearly erroneous" standard applies. Each also opined that the "clearly erroneous" standard is somewhat more exacting than the "arbitrary and capricious" or

10

"substantial evidence" standards that are more often applied to reviews of administrative proceedings.

In this case, whether there is a difference between the Elaine's Cleaning standard and the Dantran standard is immaterial.  The Court has reviewed the evidence presented to the Department of Labor both to determine whether the ALJ and the ARB properly applied the preponderance of standard to the evidence before them, and also whether their factual findings are clearly erroneous.  In the Court's view, the evidence satisfies either standard.

B.

It is undisputed that Rasputin did not pay its guard employees the pay rate and benefits provided for in the May 17, 1995 addendum to the collective bargaining agreement between DGS and the union which represented its security guard employees.  Although Mr. Johnson argues at great length that the two addenda which were attached to his contract created an ambiguity about which rate of pay should be used, and that either of those rates of pay is less than the rate of pay set forth in the addendum in the Collective Bargaining Agreement, the Court agrees that the Administrative Review Board decided this issue entirely correctly.  There are two components to the decision: whether the $5.12 per hour pay rate ever applied to the security guards employed by Rasputin, and, if it did not, whether the applicable rate was the one contained in the 1994 addendum to the Collective Bargaining Agreement or the 1995 addendum.

With respect to the first issue, the only possible confusion resulted from the fact that Rasputin's contract represented a consolidation of prior contracts under which DGS paid different pay rates to security guards at different facilities.  The ARB, citing 29 C.F.R. §4.163(g), noted that under these situations, if the predecessor contracts involve the same or similar work

11

functions, the predecessor contract covering the greater portion
of the work shall be deemed to be the contract which the follow-
on contractor is required to follow with respect to the payment
of wages and fringe benefits.

The ARB found as a fact that the contract containing the
higher wage rate was the one which covered the greater portion of
the work.  There was unrebutted testimony before the ALJ to that
effect.  Consequently, under any standard of review, the Court is
required to affirm the ARB's decision that the higher wage rate
applied to the guards employed by Rasputin.

The only other question is which higher wage rate applied.
Rasputin's sole argument with respect to the 1995 addendum to the
collective bargaining agreement is that the agreement was not
incorporated into Rasputin's contract and, in any event, Rasputin
was not required to pay that rate because DGS never paid it.  The
determination of this issue depends upon the proper
interpretation of Section 4(c) of the SCA, 41 U.S.C. §353(c).
That section provides that if a contractor succeeds to a contract
under which substantially the same services are provided, the
contractor is required to pay any service employee at least those
wages and fringe benefits which were provided for in a collective
bargaining agreement between the predecessor contractor and the
union representing the employers including "any prospective
increases in wages and fringe benefits...."  The only exception
set forth in the statute itself is if the Secretary of Labor
finds, after a hearing, that the bargained-for wages and fringe
benefits are substantially at variance with prevailing wages and
benefits in the applicable locality.  That did not occur in this
case.

Mr. Johnson nevertheless argues that under 29 C.F.R.
§4.163(f), Rasputin was not required to pay the increase in
wages.  That subsection provides that Section 4(c) of the SCA is

12

operative "only if the employees who worked on the predecessor contract were actually paid in accordance with the wage and fringe benefit provisions of a predecessor's contractor's collective bargaining agreement."  The example given by the regulation is that the statute would not apply if the predecessor contractor entered into a collective bargaining agreement "for the first time, which did not become effective until after the expiration of the predecessor contract."

Although the increase represented by the May 17, 1995 addendum to the Collective Bargaining Agreement did not become effective until October 1, 1995, after the expiration of DGS's contract, there was a collective bargaining agreement in place with the employees under which DGS paid wages and benefits to its employees.  Section 4(c) of the SCA clearly applies to prospective increases in wages and fringe benefits such as the ones negotiated here.  This is not a situation where DGS previously had no collective bargaining agreement, but negotiated one which did not become effective until after the expiration of its contract.  Consequently, the ARB correctly determined that Mr. Johnson's challenge to the applicability of the collective bargaining agreement was without merit.

Mr. Johnson's only other claim on this issue is that the collective bargaining agreement addendum was not incorporated into his contract and therefore he was not bound by it.  However, 29 C.F.R. §4.163(b) provides that Section 4(c) of the SCA is self-executing.  Since it creates a direct statutory obligation of the successor contractor, it is "not contingent or dependent upon the issuance or incorporation in the contract of a wage determination based on the predecessor contractor's collective bargaining agreement."  Again, the Court agrees with the ARB that, because of the self-executing nature of Section 4(c), whether the addendum to the collective bargaining agreement was

13

or was not incorporated into Rasputin's contract is irrelevant. Rasputin had the statutory duty to pay those bargained-for wages, and that statutory duty was referenced in Rasputin's contract. It failed to discharge that duty.

Mr. Johnson makes no other specific challenges to the calculation of the amount owed. There was evidence before the ALJ and the ARB as to that amount. As a factual matter, both the ALJ and the ARB could have found by a preponderance that the amount owing was $173,460.34, as attested to by the affidavit of Terri Whaley. Consequently, the Court affirms the DOL's decision that Rasputin owed that amount and, by failing to pay it, violated the SCA.

C.

The next question is whether the DOL properly determined that Mr. Johnson was a "party responsible" for Rasputin's SCA violations. The standard of review applicable here, which calls for less than a de novo review of the evidence presented to the ALJ, is again determinative. Under either an "arbitrary and capricious," "substantial evidence," or "properly applied a preponderance of the evidence" standard of review, there was sufficient evidence before the DOL to allow it to find that William Johnson was legally responsible for Rasputin's violations of the SCA.

Essentially, the ALJ was tasked with determining whether the testimony of Wayne Stewart or William Johnson was more credible. The parties' statements at the administrative hearing cannot be reconciled. Mr. Stewart's testimony is clearly sufficient to permit the conclusion that William Johnson was a responsible party, because Mr. Stewart testified unequivocally that Mr. Johnson made all of the decisions concerning administration of the contract, including the decision not to pay the wage rates set forth in the applicable collective bargaining agreement.

14

Mr. Johnson argues that Mr. Stewart's testimony should not
have been relied upon because Mr. Stewart had an interest in
deflecting the blame for violations from himself to someone else.
The Court notes, first, that Mr. Stewart was never alleged by the
DOL to have been the party responsible, and it is not clear to
what extent the DOL could have instituted proceedings against him
after the administrative hearing or to what extent his testimony,
if it had been otherwise, would have subjected him to liability.
Further, although there was some suggestion that the parting of
the ways between Mr. Johnson and Mr. Stewart was less than
amicable, Mr. Stewart need not have deflected responsibility to
William Johnson in order to absolve himself.  William Johnson's
brother was the President of Rasputin, and another individual
served as Vice President.  Had Mr. Stewart simply been willing to
perjure himself in order to absolve himself of responsibility, he
could have placed responsibility on one of the two corporate
officers.  Thus, although there may have been some reasons for
the ALJ to evaluate critically Mr. Stewart's testimony, those
reasons were not so compelling as to force the conclusion that
Mr. Stewart's testimony could not satisfy the "preponderance of
the evidence" standard under which the ALJ was operating.

Mr. Johnson also points to the testimony of Darlene Ford as
the only independent evidence on this issue.  Ms. Ford, however,
worked for William Johnson during the relevant time frame, and
therefore may not have been completely independent.  Further,
nothing about her testimony indicates that, had Mr. Stewart and
William Johnson consulted on issues with respect to Rasputin, she
would necessarily have been aware of those consultations.
Further, she did not indicate that frequent meetings about
Rasputin took place either between Mr. Stewart and Mr. Johnson's
brother or Mr. Stewart and Rasputin's Vice President.  In other
words, her testimony suggested that Mr. Stewart made all of these

15

decisions by himself, even though he was also not an officer of
Rasputin and had no financial interest in it.  That testimony was
contradicted by the testimony of Earl Macon, who stated that
whenever he called Wayne Stewart with a matter pertaining to the
contract, Mr. Stewart always had to consult with someone else
before getting back to him.

Finally, the Court notes that the other Mr. Johnson, the one
who purportedly was in charge of Rasputin and, at least according
to Ms. Ford, consulted with Mr. Stewart on corporate matters, was
not called to testify.  Neither was Rasputin's Vice President.
Given the totality of the evidence presented, the conflict in
testimony, the ALJ's ability to resolve credibility matters by
having personally observed the witnesses testify, and Mr.
Johnson's clear interest in testifying the way that he did in
order to avoid substantial penalties, a reasonable person could
have concluded, as did the ALJ, that a preponderance of the
evidence supported the factual findings necessary to hold William
Johnson responsible for Rasputin's violations of the SCA.
Therefore, that decision must also be affirmed.

D.

The next issue presented is whether the Administrative
Review Board properly concluded that Mr. Johnson had not proved
that "unusual circumstances" existed and counseled against the
remedy of debarment.  The parties agree that debarment is the
usual remedy for violations of the SCA.  However, Mr. Johnson
asserts that, on this record, the DOL should have waived that
penalty.

The ARB noted, citing 29 C.F.R. §4.188(b), that a three-
stage test is applied in order to determine whether such "unusual
circumstances" exist.  That regulation precludes relief from a
debarment order where the violations at issue are the result of
culpable conduct, and also requires, in order for a contractor to

16

obtain relief, that he have a good compliance history including cooperating in the investigation in repayment of monies due, as well as sufficient assurances of future compliance.  Finally, there are other factors to be considered, including whether there were issues of doubtful legal uncertainty and the extent to which the employees were impacted by the violations.

The ARB concluded that the violations in this case were culpable, given Wayne Stewart's testimony that William Johnson was involved in all stages of administering the contract and that it was Mr. Johnson who decided not to pay the wages set forth in the contract.  Certainly, if Mr. Stewart's testimony was sufficiently credible to permit a determination that William Johnson was a responsible party, it was equally credible on the issue of whether Mr. Johnson was culpable with respect to the violations.  As the ARB also noted, Mr. Johnson did not repay the money, and the issue in this case - which contract rate controlled - was not an issue of doubtful certainty.  Although somewhat complex, the regulations involved in this matter are clear: Rasputin had an obligation to pay according to whatever collective bargaining agreement was in place between its predecessor contractor and the Union, and to pay the rate applicable to employees where the majority of the work was to be performed.  Consequently, the ARB found, and that finding is supported by a preponderance of the evidence, that "unusual circumstances" had not been established.  The Court affirms that finding.

E.

Finally, Mr. Johnson argues that 11 U.S.C. §525 prohibits imposing the remedy of debarment because the remedy is based upon his failure to pay Rasputin's obligation.  Because that is an obligation which has been discharged in bankruptcy, he contends that holding the non-payment against him is tantamount to

17

discrimination against him for having filed a bankruptcy
proceeding.

The Court need not reach the issue of whether the bankruptcy
code operates in the way suggested by Mr. Johnson.  In this case,
his debarment was based upon his failure to demonstrate "unusual
circumstances," only one of which was the failure to repay the
obligation.  Even if he had repaid the obligation, because the
ARB found that he engaged in culpable conduct, it would still
have debarred him from further contractual proceedings for a
period of three years.  Thus, the decision was not based solely
upon Mr. Johnson's failure to repay an obligation discharged in
bankruptcy, and his claim of discrimination under 11 U.S.C. §525
cannot stand.

                              IV.

Based upon the foregoing, the motion of summary judgment
filed by defendant, The United States Department of Labor (doc.
#7) is granted, and the cross-motion for summary judgment filed
by plaintiff, William Johnson, (doc. #16) is denied.  The Clerk
is directed to enter judgment in favor of the defendant
dismissing the complaint and affirming the decision of the
Administrative Review Board of the Department of Labor.


                              /s/ Terence P. Kemp
                              United States Magistrate Judge